UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-009 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| BRUCE LEE FELIX, | : | |
| | : | |
| Defendant. | : | |

ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (Doc. 16)

This criminal case is before the Court on Defendant's motion to suppress evidence (Doc. 16), the parties' responsive memoranda (Docs. 20, 22), and the parties' post-hearing briefs (Docs. 24, 26, 27).[1]

Also before the Court is evidence and testimony presented during the January 19, 2018 evidentiary hearing, during which the Court heard the testimony of Sergeant Justin Hussel of the Colerain Police Department's Investigative Unit, as well as Special Agent Joseph Klump of the Federal Bureau of Investigation ("FBI"). (Min. Entry, Jan. 19, 2018).

I. BACKGROUND

On January 18, 2017, Defendant Bruce Lee Felix was charged by way of a three-count indictment with the following offenses: bank robbery, in violation of 18 U.S.C. § 2113(a) (Count 1); armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d) (Count

---

[1] Also pending before the Court is Defendant's motion to suppress pretrial voice identifications. (Doc. 15). At the parties' request, the Court held separate hearings on Defendant's two motions to suppress. The Court will resolve the voice identification motion by separate order.

2); and using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3). (Doc. 1). The charges arise, in part, from evidence obtained by the Colerain Police Department and the FBI during a search of Defendant's sister's home. (Doc. 16). Defendant moves for suppression of said evidence, arguing that it was obtained without the benefit of a warrant and in violation of his constitutional rights, and that his sister did not have the proper authority to consent to the search. (*Id.*)

For purposes of this Order, the Court will rely upon the facts as set forth in the parties' briefs (Docs. 16, 20, 22, 24, 26, 27), as well as the testimony and evidence presented at the January 19, 2018 suppression hearing.[2]

## II. FACTS

In February and June 2015, two separate banks within the Southern District of Ohio were robbed by a masked, armed intruder. In July 2015, law enforcement received a tip that Defendant Bruce Lee Felix was responsible for both robberies.[3]

On October 19, 2016, law enforcement officers from the FBI, Colerain Township Police Department, and Harrison Police Department interviewed Defendant's sister ("Ms. Felix") at her residence. (Doc. 23 at 6-7; Gov. Ex. 4). Ms. Felix voluntarily submitted to

---

[2] Exhibits admitted during the suppression hearing have not been electronically filed, but are part of the record, and remain in the Court's custody.

[3] Details regarding the two robberies and the subsequent investigation will be more thoroughly addressed in the Court's Order on Defendant's voice identification motion.

the interview, welcoming law enforcement into her home and speaking cordially with them for nearly two hours. (Doc. 23 at 7-8; Gov. Ex. 4).[4]

Ms. Felix explained to officers and agents that, over the years, Defendant had occasionally stayed as an overnight guest in her home, including staying with her approximately two years prior to the interview (*i.e.*, mid to late 2014 or early 2015). (*Id*. at 47:30). Ms. Felix ultimately became upset with Defendant's behavior and drug use and encouraged him to move to Indiana with his (now former) girlfriend. (*Id*. at 44:30). At that time, Ms. Felix packed Defendant's belongings and told him to take them with him. (*Id*. at 44:45). Despite the instruction, Defendant apparently left some of his belongings in Ms. Felix's home. (*Id*. at 1:46:30). Ms. Felix estimated that Defendant lived in Indiana for approximately one year, and then stayed with friends and family, before returning to her home prior to his arrest in October 2016. (*Id*. at 42:00, 47:30, 1:04:00).

Before returning to Ms. Felix's home in October 2016, Defendant was staying with his friend, Rob Wesley ("Mr. Wesley"). (*Id*. at 42:00). When Defendant left Mr. Wesley's home, he drove off, without permission, in Mr. Wesley's work truck, forcing Mr. Wesley to report the truck as stolen. (*Id*. at 12:30).[5] A few days later, Defendant arrived at Ms. Felix's home, presenting in a poor mental state. (*Id*.) He had not eaten or

---

[4] An audio recording of Ms. Felix's interview was admitted as Government's Exhibit 4. The recording captures the two hour conversation between Ms. Felix and law enforcement prior to commencement of the search.

[5] Defendant's October 2016 arrest appears to have resulted from the theft of the truck, rather than the instant federal charges.

3

bathed in days and had been sleeping in Mr. Wesley's truck. (*Id*. at 12:50, 14:00). In light of Defendant's condition, Ms. Felix immediately took him to the hospital, where Defendant was kept for observation and treatment for five days. (*Id*. at 13:12). Ms. Felix also called Mr. Wesley to report that his truck was in her parking lot. (*Id*. at 12:30). Mr. Wesley subsequently arrived to retrieve the truck and also brought the belongings Defendant had left at his home. (*Id*. at 12:30, 1:04:00, 1:47:20).

Upon his release from the hospital, Defendant returned to Ms. Felix's home, although Ms. Felix noted that she did not intend for the living arrangement to be permanent. (*Id*. at 16:15, 1:04:30). Ultimately, Defendant stayed with Ms. Felix for only two days before he was arrested in mid-October 2016 (*i.e.*, approximately one week prior to the October 19, 2016 interview). (*Id*. at 16:15).

During her discussion with law enforcement, Ms. Felix explained that she frequently opens her home to family members, joking that she "run[s] a homeless shelter for all the men in [her] family," and that her guest bedroom was where her "homeless people live." (*Id*. at 1:47:00). Ms. Felix noted that Defendant's son was staying in the guest bedroom immediately prior to Defendant's arrival and that Ms. Felix's daughter had used the guest bedroom in the last week (*i.e.*, after Defendant was arrested). (*Id*. at 16:15, 1:49:41).

Further, Ms. Felix told law enforcement that, in addition to allowing others to use the guest bedroom, she also slept in the guest bedroom from time to time. (Doc. 23 at 14). Ms. Felix also used the room for her own personal use and, indeed, law enforcement

observed that Ms. Felix had her computer and her ashtray in the room at the time of the interview and subsequent search. (*Id.*)

Ms. Felix explained that when Defendant previously stayed in her home, he had slept in her living room on either the couch or the floor. (Gov. Ex. 4 at 48:40). However, during his most recent stay, Defendant was sleeping in the bed (presumably, in the guest bedroom). (*Id.*)

Regardless, as Ms. Felix explained to law enforcement, during the two days Defendant stayed with her, "he stored his clothes in the corner of my [Ms. Felix's] living room." (*Id.* at 1:04:00). Ms. Felix further noted that "when Rob Wesley brought [Defendant's] stuff, we just set it on my [Ms. Felix's] floor." (*Id.*) Ms. Felix explained that Defendant had few belonging with him when he arrived and that he already had some items at her home, which items Defendant had left behind after moving out of Ms. Felix's home years prior. (*Id.* at 1:47:35).[6]

Ms. Felix confirmed that Defendant's belongings were still in her home. (*Id.* at 1:46:30). However, Ms. Felix informed law enforcement that she had cleaned up after Defendant following his arrest. (*Id.* at 1:50:15). Ms. Felix told Sgt. Hussel that Defendant's belonging were previously piled in the corner of the living room, in plain view, next to the couch and the sliding glass door. (Doc. 23 at 21, 43). However, after Defendant's arrest, Ms. Felix moved his belongings from the living room into the guest

---

[6] No evidence was presented to identify which items Defendant left in Ms. Felix's home years prior, the items Defendant had left at Mr. Wesley's home, and the items that Defendant had with him when he arrived at Ms. Felix's home.

5

bedroom because "she got tired of looking at [them] …." (*Id*. at 13, 44). In other words, the state in which law enforcement found the items on October 16, 2018 was not an accurate reflection of how Defendant had kept them, but rather how Ms. Felix put the items away.

When law enforcement asked to see the items, Ms. Felix led law enforcement into the guest bedroom and directed them toward the closet. (Gov. Ex. 4 at 1:49:20; Doc. 23 at 45, 77). Ms. Felix generally indicated that Defendant's belongings were in the closet, but did not specifically identify which items belonged to Defendant and which did not. (*Id*. at 85). Ms. Felix signed a written consent to search form prior to commencement of the search. (Gov. Ex. 1).

Inside the guest bedroom closet, officers observed clothes, DVDs, children's board games, a plastic bags, and a large, open-topped laundry basket. (*Id*. at 46).[7] Inside of the laundry basket were three open-topped, cloth/canvas reusable grocery bags: one black, one tan, and one blue. (*Id*.) The tan bag was placed inside the black bag. (*Id*. at 47). While the bags were opaque on the sides, they were open on top and had no mechanism for closure. (Gov. Ex. 2F-2S; Doc. 23 at 46-47).[8]

---

[7] Some of Defendant's clothing was also hanging up in Ms. Felix's bedroom closet. (Doc. 23 at 91).

[8] A blue, zippered duffel bag, found by the door of the guest bedroom, was also identified as belonging to Defendant. However, law enforcement did not seize the duffel and the only item retrieved from it was the green plastic pipe. Agent Klump testified that he believes the duffel bag was not zipped, as he does not recall having to unzip the bag. (Doc. 23 at 56).

6

Agent Klump testified that, without manipulating the black bag or its contents, he could see that inside the bag were a pair of black gloves, a black cloth hood/mask, and various pieces of jewelry/rings. (*Id.*) Ms. Felix told law enforcement that she had personally cleaned the jewelry and placed it in the bag. (*Id.* at 30, 48). Agent Klump noted that the rings were at the bottom of the bag, underneath other items. (*Id.* at 97). Agent Klump further testified that he could also see inside the tan bag, and that the bag was filled with pre-set zip ties, similar to those used to bind the victims in the armed robbery of the Cheviot Savings Bank. (*Id.* at 47). The interior of the blue bag was also visible and contained toiletries. (*Id.*)

In sum, based on the inventory log, officers recovered the following items during the search: a black cloth shopping bag containing miscellaneous jewelry and rings, black gloves, and a black cloth mask (the latter two items being consistent with items used in both robberies); a tan cloth bag containing white, pre-set zip ties (consistent with those used in the armed robbery of the Cheviot Savings Bank); a blue cloth shopping bag containing toiletries; black Harley boots; and a green plastic pipe. (Gov. Ex. 3).[9]

### III. STANDARD OF REVIEW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures …." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—

---

[9] Agent Klump took pictures of the room and bags to document the search. (Gov. Ex. 2A-2X). To preserve DNA evidence, the items were not removed from the bags. (Doc. 23 at 50).

subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). The exclusionary rule serves to deter law enforcement from obtaining evidence by unconstitutional means. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). So critical is the goal of deterring violations of constitutional and statutory protections that exclusion is the appropriate remedy "notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes." *Id.* at 443.

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)). However, "[t]he Government has the burden of proof to justify a warrantless search." *United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002); *Coolidge v. New Hampshire*, 403 U.S. 443, 455 (1971) ("The burden is on those seeking the exemption to show the need for it") (quotation marks and citations omitted).

## IV. ANALYSIS

Defendant moves to suppress all evidence obtained as a result of the warrantless search of the personal property in his sister's residence. (Doc. 16). Although Defendant initially argued that his sister lacked authority, actual or apparent, to consent to the search of the guestroom, he subsequently conceded the argument in his post-hearing briefs. (*Id*. at 2; Doc. 24 at 2). However, Defendant maintains the position that his sister's authority to consent to a search of the room did not extend to the personal items found in the closet and, accordingly, law enforcement were required to obtain a warrant to search the bags. (*Id*.)

In response, the Government argues as a threshold issue that Defendant lacks standing to contest the search. (Doc. 20 at 3-7).[10] Specifically, the Government argues that the Defendant lacked a reasonable expectation of privacy in the belongings he left at his sister's home. (*Id*.) Moreover, the Government argues that Defendant's sister had actual and apparent authority to consent to the search of the property. (*Id*. at 7-9). Thus, the Government argues that, even if Defendant has standing, no Fourth Amendment violation exists and the Defendant's motion to suppress should be denied.

As stated more fully below, the Court finds that Defendant lacks standing to contest the search and, alternatively, that Ms. Felix had both actual and apparent authority to consent to the search.

---

[10] The Government somewhat conflates the argument as to standing and consent. However, the Court will address both independently.

### A. Standing[11]

"'The Fourth Amendment <u>protects people, not places</u>,' and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson,* 495 U.S. 91, 96 n. 5 (1990) (quoting *Katz*, 389 U.S. at 351) (emphasis added). "Because Fourth Amendment rights are 'personal,' the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005) (quoting *Rakas v. Illinois,* 439 U.S. 128, 143 (1978)).

Defendant bears the burden to show a legitimate privacy interest. *United States v. Whitehead,* 415 F.3d 583, 587 (6th Cir. 2005). To satisfy this burden, Defendant must show that: **first**, he "by [his] conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private"; and **second**, the "expectation of privacy is one that society is prepared to recognize as reasonable." *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000) (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000)).

---

[11] While the parties and the Court refer to the issue of Defendant's "standing" to challenge the search, the Court notes that, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter,* 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois,* 439 U.S. 128, 140 (1978)). Thus, despite references to "standing," this Court reviews the issue as a question of substantive Fourth Amendment law.

The Court must make a case-by-case determination as to whether a legitimate expectation of privacy exists. *Waller*, 426 F.3d at 844. In making this determination, the Court may consider a number of factors, including:

> the person's proprietary or possessory interest in the place to be searched or item to be seized; whether the defendant has the right to exclude others from the place in question; whether he had taken normal precautions to maintain his privacy; whether he has exhibited a subjective expectation that the area would remain free from governmental intrusion; and whether he was legitimately on the premises.

*Id*.

For a subjective expectation of privacy to be legitimate, it "must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143 n.12. Notably, the Sixth Circuit "generously construe[s] the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." *United States v. Washington*, 573 F.3d 279, 283 (6th Cir. 2009) (citing *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000)). "Nevertheless, this generosity does not arise without some measure of proof by a defendant. Whether an informal sleeping arrangement creates a reasonable expectation of privacy naturally begets a fact-dominated inquiry for a court." *United States v. Wix*, No. 1:11-CR-00015-R, 2012 WL 2160562, at *5 (W.D. Ky. June 13, 2012).

Here, the Court recognizes that overnight guests are given broad protection under the Fourth Amendment. Thus, Defendant may assert that he maintained a reasonable

expectation of privacy within the home.  However, this case poses a unique set of circumstances in which the Court cannot conclude that Defendant, by his conduct, manifested <u>any</u> actual or legitimate expectation of privacy in the place to be searched (*i.e.*, the bags) or the things to be seized (*i.e.*, the evidence).  In other words, the mere fact that Defendant was an occasional overnight guest, by virtue of that invitation alone, cannot logically give him a reasonable expectation of privacy going forward in every closet, cabinet, and crevice of the residence.

The Court emphasizes that Defendant bears the burden to show a legitimate expectation of privacy, which requires, first and foremost, a showing that Defendant "by [his] conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private." *King*, 227 F.3d at 743.  And in that regard, Defendant has failed to evidence that he manifested any expectation of privacy in the bags searched or the items seized.  Indeed, Defendant has failed to even assert, through sworn testimony or any evidentiary showing, that either the bags searched or the items seized belonged to him.  This is a fundamental proposition in order for the Court to "determin[e] whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights …." *See Carter,* 525 U.S. at 88.  Further, the Government's evidence belies the assertion that Defendant was the person who placed the items in the bags or otherwise took any steps to conceal the items, or even that Defendant maintained or intended to maintain custody of the items.  Defendant presents no evidence to the contrary.

Moreover, there is absolutely no evidence in the record from which to conclude that Defendant displayed, articulated, or even intended a legitimate expectation of privacy through the use of "normal precautions." *King*, 426 F.3d at 844 (quoting *Bond*, 529 U.S. at 338). Indeed, the evidence indicates that Defendant had a history of abandoning his unsecured property wherever he stayed and having his former hosts chase after him to return the items. *See United States v. Eastman*, 645 F. App'x 476, 479 (6th Cir. 2016) ("a person who voluntarily abandons property in the absence of an unconstitutional seizure has no legitimate expectation of privacy in it, and therefore its search or seizure does not violate *his* Fourth Amendment rights") (collecting cases) (emphasis in original). The evidence further suggests that, prior to being placed in the bags and stored in the closet by Ms. Felix, the items were haphazardly piled in the corner of Ms. Felix's living room—a pile which Defendant notably did not even make. And Defendant presents no evidence to clarify which items from the living room pile were items he brought with him from Mr. Wesley's (the evidence suggests virtually none), as opposed to items that he abandoned in Ms. Felix's home years prior or abandoned in Mr. Wesley's home before taking off unannounced with Mr. Wesley's truck.

If ever there were a case where a defendant's failure to show even the slightest consideration for his belongings would undermine his assertion of standing, it would be this case.

In assessing the factors this Court must consider: (1) Defendant has fundamentally failed to assert any proprietary or possessory interest in the bags searched or the items seized; (2) Defendant has not only failed to maintain any right to exclude others from the

property, he has willingly abandoned the property at every turn; (3) Defendant has not taken any evidenced precautions to maintain his privacy; and (4) Defendant has exhibited no subjective expectation that the area would remain free from governmental intrusion or any intrusion for that matter. *See Waller*, 426 F.3d at 844. The only factor which may favor Defendant's position is that he had legitimate access to the home and likely to the closet and bags.

Thus, the Court finds that Defendant has failed to establish standing to contest the search of the bags or seizure of the items. However, given the Sixth Circuit's generosity in extending Fourth Amendment protection to overnight guests, the Court will undertake the consent analysis as well.

### B. Authority to Consent to the Search

"Consent [is] a 'specifically established exception[ ] to the requirements of both a warrant and probable cause' … [and] is constitutionally sufficient." *Eastman*, 645 F. App'x 476, 479 (6th Cir. 2016) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). In a co-habitation setting, officer may rely on the consent to search given by an individual who has actual or apparent common authority over the place to be searched or thing to be seized. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008) (citations omitted). Notably, however, "authority to consent to the search of [a common area] does not necessarily extend to the search of containers in the [common area]." *United States v. Cork,* 18 F. App'x 376, 383 (6th Cir. 2001).

In short, "[a] valid consent to search [a] closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of

14

the property, and one who generally has joint access or control for most purposes."
*Waller*, 426 F.3d at 845 (citing *United States v. Karo,* 468 U.S. 705, 725-26 (1984)). The government bears the burden of establishing the effectiveness of a third party's consent. *Waller*, 426 F.3d at 845 (citing *Illinois v. Rodriguez,* 497 U.S. 177, 181 (1990)).

Here, the Court finds that Ms. Felix had both actual and apparent common authority to consent to the search. Accordingly, suppression of the evidence is not warranted.

*1. Actual Authority*

Actual common authority refers to:

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Caldwell*, 518 F.3d at 429 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n. 7 (1974)).

Ms. Felix had joint access, control, and use of the bags and items, such that it was reasonable to recognize that she could permit an inspection or search. As an initial matter, the evidence shows that Defendant brought very few belongings with him to Ms. Felix's home. Indeed, most of the items he had in Ms. Felix's home were items he either left behind years prior and never retrieved or they were left at the home of his friend, Mr. Wesley, who brought the items to Ms. Felix. Ultimately, when Mr. Wesley gave the items to Ms. Felix, she placed them in her living room, where Defendant took no

15

evidenced steps to conceal them in any fashion. After Defendant's arrest, Ms. Felix cleaned up the items herself and stored them in the closet of her guest bedroom—a room of such common use that Ms. Felix described it to law enforcement as "a homeless shelter for all the men in [her] family." (Gov. Ex. 4 at 1:47:00).

In light of these circumstances, it is frankly counterintuitive to question Ms. Felix's authority to consent to the search of items she herself placed in the bags (at least in part) and stored in her closet, or to extend to Defendant the benefit of any protection afforded by the storage of the items. There is no evidence that Defendant ever told Ms. Felix not to touch his belongings, and Defendant's conduct in effectively abandoning the items repeatedly and ultimately keeping them in an unsecured pile in Ms. Felix's living room belies the notion that he intended or expected to maintain exclusive authority over them. Rather, the evidence shows that Defendant left certain items with Ms. Felix for years, even after she expressly requested that they be removed. The evidence also shows that Defendant left his own belongings behind at Mr. Wesley's and drove off with Mr. Wesley's truck. The evidence shows that when his belongings were returned, Defendant left them unsecured and stacked in Ms. Felix's living room, despite having access to a zippered duffel bag. The evidence further shows that Ms. Felix had ready access to the items and that she did in fact access them. At the very least, Ms. Felix hung up and organized Defendant's clothes, put away his shoes, cleaned his jewelry and placed them in a bag, and likely placed additional items in the bags as well (given that the jewelry was found beneath everything else).

In short, Ms. Felix's access to and use of the items Defendant left behind in her home after he moved out years prior, as well as the items that Defendant left unsecured and stacked in her living room, renders it reasonable to recognize that she had the right to permit the inspection of the items; and Defendant assumed that risk by his own conduct. *See Matlock*, 415 U.S. at 171 n. 7.

Accordingly, Ms. Felix had actual authority to consent to the search of the bags and the items.

  2. *Apparent Authority*

"The apparent-authority doctrine excuses otherwise impermissible searches where the officers conducting the search 'reasonably (though erroneously) believe that the person who has consented' to the search had the authority to do so." *United States v. Taylor*, 600 F.3d 678, 681 (6th Cir. 2010) (quoting *Rodriguez,* 497 U.S. at 186). The reasonableness of the officers' belief is judged objectively, based on the information known to the officers at the time. *United States v. Purcell*, 526 F.3d 953, 963 (6th Cir. 2008) (citing *Rodriguez,* 497 U.S. at 188). "Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, 'warrantless entry without further inquiry is unlawful.'" *Waller*, 426 F.3d at 846 (quoting *Rodriguez,* 497 U.S. at 188-89).

Here, the Court looks to what law enforcement knew at the time of the search and seizure of the bags and the items contained therein. The search occurred after law enforcement spent two hours talking with Ms. Felix, during which she stated she was in possession of a number of items that Defendant had effectively abandoned in her home

17

years prior, as well as items that Defendant had left behind at Mr. Wesley's home before Defendant stole Mr. Wesley's truck and left without a word. Ms. Felix told officers that she had piled the items in her living room and that they remained there, with Defendant making no attempt to secure them in any fashion. Law enforcement knew that Defendant's failure to secure the items was in spite of the fact that he was using the guest bedroom (*i.e.*, a room with a door and a closet) and had a duffel bag with zippers. Law enforcement knew that Ms. Felix ultimately removed Defendant's items from her living room, cleaned his jewelry and placed it in the bag, and put everything away in the guest bedroom closet. Law enforcement knew that the guest bedroom was a commonly used space, which Defendant was also aware of given that his son was living in it when Defendant arrived. Officers knew that Ms. Felix had unfettered access and made frequent use of each room in her home, including the living room, the guest bedroom, and the guest bedroom closet.

Given the manner in which Defendant left his belongings unsecured (if not leaving them behind entirely for others to contend with), as well as the level of authority, access, and control that Ms. Felix had demonstrated over the items, and without any apparent indication that Defendant had attempted to maintain sole custody and control over the items, it was entirely reasonable for officers to conclude that Ms. Felix had authority to consent. Indeed, it would be difficult for Defendant to argue that he intended to maintain sole access and authority over the items that he repeatedly walked away from and then left in a pile in his sister's living room. And, under the circumstances, there was no ambiguity or reason to question Ms. Felix's authority over the bags and items.

Accordingly, even assuming that Ms. Felix lacked actual authority to consent, the Court finds she had apparent authority.

## CONCLUSION

In sum, Defendant has evidenced only that he was an occasional overnight guest of his sister. Defendant has failed to meet his burden of evidencing ownership of, interest in, or a legitimate expectation of privacy as to the property found in Ms. Felix's home. The Court therefore finds that Defendant lacks standing to challenge the search.

Moreover, the Court finds that Ms. Felix had both actual and apparent authority to consent to a search of the bags.

Accordingly, Defendant's motion to suppress evidence (Doc. 16) is **DENIED**.

**IT IS SO ORDERED.**

Date: May 9, 2019

Timothy S. Black
United States District Judge