# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:17-cr-009 |
| vs. | : | Judge Timothy S. Black |
| BRUCE LEE FELIX, | : | |
| Defendant. | : | |

## ORDER DENYING DEFENDANT'S MOTION
## TO SUPPRESS PRETRIAL VOICE IDENTIFICATIONS (Doc. 15)

This criminal case is before the Court on Defendant's motion to suppress pretrial voice identifications (Doc. 15), the Government's response in opposition (Doc. 19), and the parties' post-hearing briefs (Docs. 29, 30, 31).

Also before the Court is the evidence and testimony presented during the March 1, 2018 evidentiary hearing, during which the Court heard the testimony of Lieutenant Detective Steven Mathews of the Harrison Police Department. (Min. Entry, Mar. 1, 2018).

## I. BACKGROUND

On January 18, 2017, Defendant Bruce Lee Felix was charged by way of a three-count indictment with the following offenses: bank robbery, in violation of 18 U.S.C. § 2113(a) (Count 1); armed bank robbery, in violation of 18 U.S.C. § 2113(a), (d) (Count 2); and using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 3). (Doc. 1).

Defendant moves to suppress any pretrial voice identifications made by the witnesses, arguing that the identifications were the direct result of unduly suggestive identification procedures and were unreliable. (Doc. 15). Defendant further moves to prevent any further in-court identifications at trial. (*Id*.)

For purposes of this Order, the Court will rely upon the facts as set forth in the parties' briefs (Docs. 15, 19, 29, 30, 31), as well as the testimony and evidence presented at the March 1, 2018 suppression hearing. (Doc. 28).[1]

## II. FACTS

### A. The Bank Robberies[2]

On February 4, 2015, a masked, armed intruder forcibly entered the Cincinnatus Savings and Loan bank in Colerain Township, Ohio. (Doc. 16 at 2; Doc. 19 at 2). Specifically, at approximately 8:00 a.m., as the first two bank employees, ML and CG, arrived at work and approached the rear door, a man wearing a black mask emerged from behind the bushes and demanded entry into the bank. (*Id*.) He informed the two employees that he was robbing the bank and demanded that they turn off the alarm. (*Id*.) Once inside, the armed robber zip-tied one bank employee, CG, and threatened to "fuckin' kill" her if she looked at him. (*Id*. at 2, n.1). The intruder then forced ML to

---

[1] A transcript of the evidentiary hearing is available on the docket. (Doc. 28). Exhibits admitted during the suppression hearing have not been electronically filed, but are part of the record, and remain in the Court's custody.

[2] Although the bank employees present during the robberies have already been identified on the record, the Court will use the employees' initials for purposes of this Order. For reference, the employees from the February 2015 Cincinnatus Savings and Loan robbery are ML and CG, and the employees from the June 2015 Cheviot Savings Bank robbery are TP, GV, CU, and CC.

remove money from the vault and place it into a bag that the robber had brought with him. (*Id*. at 2). As soon as the robber had the money, he zip-tied ML and fled on foot out the back door. (*Id*.) In total, the robbery lasted approximately 30 minutes. (*Id*.)

On June 17, 2015, the Cheviot Savings Bank in Harrison, Ohio was also robbed.[3] Early that morning, before the bank was open, an armed man in a black mask hid near the bank's employee entrance. At approximately 7:50 a.m., the armed man confronted the first Cheviot Savings Bank employee to arrive at work, TP, and forced him to unlock the door. The man told TP not to "fucking move" and not to "fuck around." The armed man then forcibly led TP into the bank at gunpoint. The robber made TP lie on the floor as he proceeded to restrain him with zip-ties. TP was alone with the robber for approximately 30 minutes, during which the robber spoke to TP, including questioning him about when and how many other employees were expected to arrive. He told TP, "I will kill you if you're wrong."

At approximately 8:20 a.m., GV arrived for work at the bank. The robber held TP and GV in the employee kitchen area and awaited the arrival of another employee. When CU arrived at work around 8:45 a.m., the robber made GV and CU open the vault and begin placing the money in blue canvas bags. He told them he would not hurt anyone if they cooperated. After CC arrived at 8:50 a.m., the robber brought her to the vault at gunpoint and had her place money in the bags as well. During this time, TP was still

---

[3] Security footage showing the Cheviot Savings Bank robbery was admitted as Government's Exhibit 1. Without further citation, the Court's recitation of the Cheviot Savings Bank robbery is based on the security video footage, and supplemented by the victims' written statements, which statements were admitted as Government's Exhibits 5 and 8.

3

restrained in the employee kitchen area, but the robber was speaking to him constantly. At around 8:55 a.m., the robber zip-tied GV, CC, and CU in the vault, before taking the bags of money and fleeing on foot out the back entrance. After the robber fled, TP was able to free himself and his co-workers from the zip-ties and call the police.

Lt. Steven Mathews of the Harrison Police Department ("HPD") received and responded to the robbery call, arriving at Cheviot Savings Bank within 10 minutes. (Doc. 28 at 6).[4] Other officers, as well as agents with the Federal Bureau of Investigation ("FBI") were already on-scene. (*Id*. at 38). Upon arrival, Lt. Mathews immediately made contact with the four victims. (*Id*. at 6). The victims each gave Lt. Mathews a physical description of the intruder. (*Id*. at 7). Lt. Mathews testified that each of the victims also described the robber as having a distinctively deep voice. (*Id*. at 14, 20). At least two victims, TP and CU, also provided written statements and completed the Cheviot Savings Bank's Robbery Physical Description Sheet. (*Id*. at 10-11; Gov. Exs. 5, 6, 8, 9).

Shortly after arriving at the bank, Lt. Mathews was joined by Detective Denny Deaton of the Colerain Township Police Department ("CTPD"). (Doc. 28 at 38-39). Det. Deaton, who was in charge of the investigation into the February 2015 Cincinnatus Savings and Loan robbery, told Lt. Mathews that he had heard the Cheviot Savings Bank robbery broadcast and that he believed the same person may be responsible for both bank

---

[4] Lt. Mathews served with the HPD for 28 years before retiring in May 2016. (Doc. 28 at 4). Prior to his retirement, Lt. Mathews was in charge of the HPD's criminal investigation section. (*Id*.)

4

robberies. (*Id.*) As Lt. Mathews and Det. Deaton learned more details from the victims that morning, they began to highly suspect that the two robberies were in fact committed by the same person. (*Id.*)

However, beyond the four victims' descriptions and the apparent similarities between the Cincinnatus and Cheviot Savings robberies, Lt. Mathews had no information on the identity of the bank robber. (*Id.* at 17, 39).

**B. The Investigation**

In July 2015, Lt. Mathews received an anonymous letter, sent to the HPD, identifying Defendant Bruce Lee Felix as the person responsible for both the June 2015 Cheviot Savings Bank robbery and the February 2015 Cincinnatus Savings and Loan robbery. (*Id.* at 18, 22-23). Approximately a week later, Lt. Mathews received a telephone call from a man who also identified Defendant Bruce Lee Felix as the bank robber. (*Id.* at 18). Although the man would only identify himself by the first name Michael, Lt. Mathews and the FBI were able to meet and interview the caller in-person. (*Id.*) During the interview, the caller identified the author of the anonymous letter as Tara Love. (*Id.*) Lt. Mathews and the FBI then went to Ms. Love's residence and interviewed her as well. (*Id.*)

Lt. Mathews testified that while Defendant's name was the only lead on a possible suspect, the mere fact that "his name came up didn't mean I [Lt. Mathews] was sold that [Defendant] was the actual bank robber…." (*Id.* at 46-47). Thus, Lt. Mathews reached out to other law enforcement agencies in hopes of obtaining additional information about the potential suspect, Bruce Lee Felix. (*Id.* at 19).

5

In response to his inquiries, the Lawrenceburg Police Department contacted Lt. Mathews and provided a DVD of a traffic stop involving Defendant. (*Id.*) Specifically, the video, dated September 19, 2014, depicts a Lawrenceburg Police Officer conducting a traffic stop on a vehicle driven by Defendant. (Gov. Ex. 2). During the stop, Defendant and the officer hold a respectful conversation, and the stop neither ends in Defendant's arrest nor even the issuance of a citation. (*Id.*; Doc. 23 at 22).[5] Because Defendant remained in the car during the entirety of the traffic stop, he can be heard speaking to the officer but is never visible in the footage. (*Id.* at 19-20). However, given the victims' descriptions of the robber's distinctive, deep voice, Lt. Mathews thought to arrange a voice identification procedure for the victims, in order to either confirm or eliminate Defendant as a viable suspect. (*Id.* at 20, 23).

Lt. Mathews testified that he had conducted hundreds of physical and photo line-ups in his career, but had never had occasion to arrange a voice identification. (*Id.* at 5, 34). Lt. Mathews decided to execute the voice identification procedure by having the victims come down to the police station and, one-by-one, providing them with instructions on the identification process and then playing for them just the audio from the traffic stop. (Gov. Exs. 3, 4).[6]

---

[5] Defendant was pulled over for driving without his headlights on. Defendant was apologetic and informed the officer that he and his passenger were returning home from a funeral. He also told the officer that he did not have his license on him. After verifying that Defendant had a valid license, the officer returned and said that he did not want to make Defendant's day any worse, extended condolences for Defendant's loss, and sent him on his way.

[6] To ensure that the victim could hear the audio but could not see the video, Lt. Mathews turned the laptop so that the speaker was facing the victim, then used a piece of paper or file folder to shield the screen. (Doc. 28 at 30; Gov. Exs. 7, 10-13).

To ensure a fair process and to minimize the potential for suggestiveness, Lt. Mathews borrowed from the HPD's witness admonition for photographic line-ups and drafted a new voice identification admonition and instruction. (Doc. 28 at 23). He read the admonition for each of the victims immediately prior to the voice identification procedure. (*Id*. at 23, 26-27). Lt. Mathews' instruction stated as follows:

> You will be asked to listen to the audio portion of a DVD. You will not be shown the video. The fact that the audio is being played for you should not influence your judgment. You should not conclude or guess that the audio contains the voice of the person who committed a crime involving you. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses nor indicate in any way you have identified someone.

(Gov. Exs. 3, 4). Lt. Mathews also admonished the victims after their interviews not to discuss their identification interview with anyone else, explaining that he did not want them to influence each other. (Gov. Exs. 7, 12, 13).

At no point in the voice identification process did Lt. Mathews suggest or encourage the victims toward making an identification. (Doc. 28 at 24). Indeed, Lt. Mathews testified that implementing a fair and accurate voice identification procedure was equally important to his own investigation. (*Id*. at 23). Lt. Mathews explained: "I was trying to find a way to play this [traffic stop video] for the victims without leading them to believe this is absolutely the person that did it [*i.e.*, robbed the bank]. I wanted to know if it was or if it wasn't so I could determine which way my investigation was going to go further." (*Id*.)

The voice identification procedure for the four Cheviot Savings Bank employees occurred on August 14, 2015 and for the two Cincinnatus employees on August 17, 2015. (Gov. Exs. 3, 4). But for one Cincinnatus employee (ML), each of the victim's identification interviews were recorded. (Gov. Exs. 7, 10-13).[7] After each victim's identification, Lt. Mathews prepared a summary of the victim's statements and observations, which summary he compiled into two supplemental reports—one for each robbery. (Gov. Exs. 3, 4).

As to the Cheviot Savings Bank victims, TP, who had spent the most time with the robber, stated that he was "100% absolutely positive" the voice on the recording was the man who had robbed Cheviot Savings Bank. (Gov. Exs. 3, 7). As he listened to the recording, TP said the voice gave him chills. (*Id.*) He became visibly emotional and his eyes welled up with tears. (*Id.*) CU also identified the voice as belonging to the robber, noting that she was 75% certain. (Gov. Exs. 3, 10). On the other hand, GV—who had also spent a considerable amount of time with the robber (though only half as much time as TP)—said that she did not recognize the voice in the traffic stop, noting that the man on the recording had a southern drawl, whereas the robber did not.[8] (Gov. Exs. 3, 12).

---

[7] Lt. Mathews assumed that the rooms at the CTPD—where the Cincinnatus employee identifications were conducted—were recorded. (Doc. 28 at 30). Only after ML's identification interview did Lt. Mathews learn otherwise. (*Id.*) Accordingly, Lt. Mathews provided his own cell phone to another officer and asked him to record the second Cincinnatus employee's identification interview. (*Id.* at 30-31).

[8] GV noted that Defendant's birthdate, which can be heard during the traffic stop, placed him in the correct age range for the robber. Regardless, she still did not believe the voice on the recording was the same as the robber.

8

Finally, CC stated that the robber had not spoken to her enough during the robbery for her to recognize the voice. (Gov. Exs. 3, 13).

Of the Cincinnatus Savings and Loan victims, ML stated that while the tone of the recorded voice sounded right, she could not be sure if it was the robber because too much time had elapsed since the robbery. (Gov. Ex. 4). CG, however, stated that she was 75% certain the voice on the recording belonged to the robber. (Gov. Exs. 4, 11). She noted she could not be 100% certain because it had been several months since the robbery. (*Id.*) CG also became emotional while listening to the recording and began to cry as she walked to her car. (Gov. Ex. 4).

In short, only half of the victims expressed any degree of certainty that the robber and the voice on the DVD were one and the same.

### III.  STANDARD OF REVIEW

The exclusionary rule, "when applicable, forbids the use of improperly obtained evidence at trial." *Herring v. United States*, 555 U.S. 135, 139 (2009). The rule serves to deter law enforcement from obtaining evidence by unconstitutional means. *Nix v. Williams*, 467 U.S. 431, 442-43 (1984). So critical is the goal of deterring violations of constitutional and statutory protections that exclusion is the appropriate remedy "notwithstanding the high social cost of letting persons obviously guilty go unpunished for their crimes." *Id*. at 443.

"Suppression of evidence, however, has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Thus, the exclusionary rule

"applies only where it 'result[s] in appreciable deterrence.'" *Herring*, 555 U.S. at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

A defendant may seek the suppression of evidence by filing a pretrial motion with the court. Fed. R. Crim. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Patel*, 579 F.App'x 449, 453 (6th Cir. 2014) (citing *United States v. Rodriguez–Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)).

## IV. ANALYSIS

Defendant moves to suppress evidence of the pretrial voice identifications and further moves to exclude any future in-court identifications. (Doc. 15). Defendant argues that "the identifications were the direct result of unduly suggestive identification procedures and additionally were unreliable." (*Id*. at 1).

### A. Pretrial Voice Identifications

A conviction based on a pretrial identification violates a defendant's right to due process if the pretrial identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384 (1968); *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994). However, "[a]n identification infected by improper police influence … is not automatically excluded." *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012). Rather, "<u>reliability</u> is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite,* 432 U.S. 98, 114 (1977) (emphasis added). Thus, the Court must

determine whether "the procedure itself steered the witness to one suspect or another, <u>independent of the witness's honest recollection</u>." *Cornwell v. Bradshaw*, 559 F.3d 398, 413 (6th Cir. 2009) (emphasis added). If the Court determines that "the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry*, 565 U.S. at 232.

Challenges to pretrial identifications are reviewed using a two-step analysis. *United States v. McComb*, 249 F. App'x 429, 437 (6th Cir. 2007). And while the analysis was developed for visual identification procedures, *i.e.*, physical or photo line-ups, it applies equally to voice identifications. *United States v. Patton*, 721 F.2d 159, 162-63 (6th Cir. 1983) (collecting cases).

**First**, Defendant bears the burden of proving that law enforcement utilized identification procedures that were both suggestive and unnecessary. *Perry*, 565 U.S. at 238-39; *Ledbetter*, 35 F.3d at 1071. "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).

The Supreme Court has identified various "instances of suggestive procedures," such as:

> that all in the lineup but the suspect were known to the identifying witness, that the other participants in a lineup were grossly dissimilar in appearance to the suspect, that only the suspect was required to wear distinctive clothing which the culprit allegedly wore, <u>that the witness is told by the police that</u>

> they have caught the culprit after which the defendant is brought before the witness alone or is viewed in jail, that the suspect is pointed out before or during a lineup, and that the participants in the lineup are asked to try on an article of clothing which fits only the suspect.

*United States v. Wade,* 388 U.S. 218, 232-33 (1967) (emphasis added). Notably, courts recognize that "th[e] danger [of misidentification] will be increased if the police display to the witness only the picture of a single individual who generally resembles the person he saw." *Simmons*, 390 U.S. at 383; *Brathwaite*, 432 U.S. at 116 ("single-photograph displays may be viewed in general with suspicion").

**Second**, if Defendant meets his burden of showing that law enforcement utilized "an identification procedure that is both suggestive and unnecessary," then the Court evaluates the totality of the circumstances to determine whether the identification was nevertheless reliable. *Perry*, 565 U.S. at 239. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the [time of the identification], and the length of time between the crime and the [identification]." *Biggers*, 409 U.S. at 199-200.

### *1. The Procedure was Neither Suggestive nor Unnecessary*

a. Suggestive

Defendant argues that the voice identification procedure in this case was impermissibly suggestive, as the victims were asked to listen to a recording involving just one voice—that of Defendant Bruce Lee Felix. (Doc. 15 at 6-8; Doc. 29 at 1-4).

12

Moreover, Defendant asserts that the use of a traffic stop for the voice exemplar further tainted the identification procedure. (Doc. 15 at 7-8; Doc. 29 at 2-4).

Here, the Court finds that the use of the single traffic stop recording was not unduly suggestive. As an initial matter, while Defendant argues that "the officer's actions all but told the victims [that] the officers thought [Defendant] was the robber," it bears noting that of the six victim witnesses, only three provided a positive identification. (Doc. 29 at 3). If the procedure was indeed so grossly suggestive, would it not likely have resulted in most or all witnesses positively identifying the voice? This is particularly true given that two of the remaining witnesses expressed uncertainty about whether the voice on the recording was that of the robber. Surely a suggestive procedure would have, at the very least, swayed an uncertain witness.

However, here, despite using only one voice recording, Lt. Mathews took appropriate steps to minimize suggestiveness. Prior to playing the recording, Lt. Mathews gave each witness a direct admonition, repeatedly telling them that nothing about the recording should influence their judgment, that they should not conclude or guess that the voice belongs to anyone involved in the crime, that they are not obligated to identify anyone and, most notably, that "[i]t is just as important to free innocent persons from suspicion as to identify guilty parties." Moreover, while the identification procedure was not implemented by a blind administrator, the Court finds that Lt. Mathews' involvement did not influence or taint the procedure in any respect. Indeed, Lt. Mathews testified about the importance of an untainted procedure for purposes of his own investigation. In short, the efforts employed here to minimize suggestiveness are in

13

stark contrast to the instances of suggestive procedures identified by the Supreme Court. *See Wade,* 388 U.S. at 232-33.

Finally, the Court finds that the use of audio from the traffic stop was not suggestive. First, the Court rejects Defendant's hyperbolic characterization of the traffic stop as "problematic because it informed the witnesses that [Defendant] had prior contact with law enforcement for breaking the law." (Doc. 29 at 4, n.4). A traffic stop for a minor traffic infraction is a far cry from armed bank robbery. It is illogical to conclude that the witnesses were more inclined to positively identify Defendant as the man who held them at gunpoint, simply because Defendant once drove without his headlights on. Moreover, the respectful tone of the conversation between the officer and the driver, the fact that the stop did not even result in a citation, and the added sympathy of hearing that the driver was returning from a funeral, all neutralize any potential prejudice (and may have even worked to Defendant's benefit).

While the Court acknowledges that single-suspect identification procedures are strongly disfavored, "[i]t is the likelihood of misidentification which violates a defendant's right to due process, and it is this which [i]s the basis of the exclusion of evidence …." *Biggers*, 409 U.S. at 198. Here, Lt. Mathews' exceedingly conscientious approach minimized suggestiveness and the likelihood of misidentification. Accordingly, suppression is not warranted. *Id.*; *see also Perry*, 565 U.S. at 242 ("Th[e] deterrence rationale [for exclusion] is inapposite in cases … in which the police engaged in no improper conduct").

b. Unnecessary

Defendant argues that, in addition to being unduly suggestive, the single-voice identification procedure was unnecessary. Specifically, Defendant argues in his post-hearing brief, and also suggested during the hearing, that Lt. Mathews could have recreated the recording in order to provide the witnesses with some form of comparison. (Doc. 28 at 54-57; Doc. 29 at 2-4). However, as Lt. Mathews testified, there would have been no way to recreate the entire traffic stop exactly. (Doc. 28 at 54-57). Moreover, any attempt to record exemplars of similar voices outside a traffic stop setting would have created the very type of suggestive disparity that officers are told to avoid.

Further, the Court disagrees with Defendant's position that, because the dialogue did not matter, Lt. Mathews could have simply played other traffic stops for the sake of comparison. (Doc. 29 at 2, n.1). First, it is highly unlikely that Lt. Mathews could find any other stops involving deep-voiced drivers who drove without headlights, but were never cited. And any differentiation between the traffic stops—*e.g.*, a more or less congenial exchange or a more or less severe infraction—would once again have risked being suggestive based on those disparities. Moreover, even if the disparities were deliberately selected to favor Defendant—for instance, if the other traffic stops involved more significant violations—that procedure could have undermined the reliability of any witness' elimination of Defendant, thereby frustrating the entire process. As Lt. Mathews testified, his goal in implementing the voice identification procedure was to determine whether or not Defendant was actually a viable suspect. The fact that Lt. Mathews did

not stack the deck to Defendant's benefit hardly amounts to a violation of Defendant's constitutional rights.

Finally, the Court also rejects Defendant's suggestion that Lt. Mathews could have obtained a more neutral voice exemplar if he had taken Defendant into custody first. The Court reiterates that Lt. Mathews intent was to determine <u>if</u> Defendant was even a suspect worth pursuing. The fact that Lt. Mathews did not rush to arrest Defendant on the word of two anonymous sources redounds to his credit. Moreover, as Lt. Mathews noted, law enforcement was having trouble even locating Defendant. Indeed, Defendant was arrested over a year later. It would have been impractical to wait for a custodial exemplar. Accordingly, the voice identification procedure used was not unnecessary.

In sum, the Court finds Defendant has failed to meet his burden to show that, under the circumstances presented here, the pretrial voice identification procedure was either unduly suggestive or unnecessarily implemented. Therefore, suppression is not warranted. *Perry*, 565 U.S. at 241 ("The due process check for reliability … comes into play only after the defendant establishes improper police conduct").

### 2. *Reliability*

Even assuming *arguendo* that the procedures utilized were unnecessarily suggestive, the Court finds that the identifications are nevertheless reliable. *See Biggers*, 409 U.S. at 199-200.

a. <u>Opportunity to Witness the Offender During the Crime</u>

Here, the witnesses had ample opportunity to hear the voice of the armed robber. Three victims positively identified Defendant's voice as that of the robber—one Cincinnatus employee (CG) and two Cheviot Savings employees (TP and CU).

The Cincinnatus robbery lasted approximately 30 minutes, during which the robber spoke with CG. Moreover, CG was one of only two employees present. Thus, her interactions with the robber were direct and sustained.

The Cheviot Savings robbery lasted an hour in total. Notably, TP was present the entire time and undoubtedly had the most extensive interaction with the robber. Indeed, TP was alone with the robber for the first 30 minutes of the robbery. And while the other Cheviot Savings victim, CU, was only present for the last 10 minutes of the robbery, that amount of time is by no means insignificant. Moreover, CU had a number of opportunities to hear the robber speak and to communicate with him directly.

In sum, all three victims who identified Defendant's voice had ample opportunity to hear and interact with the robber. Therefore, this factor supports a finding that the witnesses' identifications are reliable.

b. <u>The Witnesses' Degree of Attention</u>

The witnesses here were not merely in the vicinity of a crime—they were held at gunpoint for between 10 minutes to an hour. Thus, even absent testimony in this regard, the Court does not hesitate to find that they were paying close attention to the robber. Therefore, this factor also evidences reliability of the identifications.

c. <u>Accuracy of the Witnesses' Prior Description of the Criminal</u>

The only prior description the witnesses provided was in stating that the robber had a distinctively deep voice. And while this description may match Defendant, it is also fairly generic. Accordingly, while this factor offers some weight to the reliability of the identification, it is admittedly limited.

d. <u>Level of Certainty Demonstrated by the Witness at the Time of the Identification</u>

CG and CU stated that they were 75% certain the voice on the recording was that of the robber. TP, who spent the most time with the robber, was 100% certain. Notably, both CG and TP became visibly emotional at the sound of Defendant's voice. This emotional reaction also evidences a level of certainty. Accordingly, this factor generally supports the reliability of the identifications.

e. <u>The Length of Time Between the Crime and the Identification</u>

The identifications were made approximately six months after the Cincinnatus robbery and just two months after the Cheviot Savings robbery. Notably, CG accounted for the passage of time, noting that she was only 75% certain because it had been several months since the robbery. Thus, the Court finds that the time that elapsed was not so lengthy as to considerably undermine the identifications.

In sum, considering the totality of the circumstances, the Court finds that the identifications were reliable, independent of any alleged suggestiveness brought on by the identification procedures. Accordingly, the Court denies the request to suppress the pretrial identifications.

### B. Future In-Court Identifications

"A conviction based on identification testimony that follows a pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Ledbetter*, 35 F.3d at 1070 (internal quotations marks and citations omitted). Otherwise, "reasons why the accuracy of [a witness's] testimony is questionable … go to the weight of the testimony and are not enough to render the testimony inadmissible." *United States v. Causey*, 834 F.2d 1277, 1285 (6th Cir. 1987).

Having already found that the pretrial identification procedure was not impermissibly suggestive, the Court declines to prohibit in-court identification testimony.

### V. CONCLUSION

Based upon the foregoing, Defendant's motion to suppress the pretrial voice identifications and to prevent future in-court identifications (Doc. 15) is **DENIED**.

**IT IS SO ORDERED.**

Date: 5/13/2019  *s/ Timothy S. Black*
Timothy S. Black
United States District Judge